UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CORK MEDICAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:15-cv-00765-DKL-TWP |
| JEFF LUKASZEWSKI, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Dkt. 7)**

Plaintiff Cork Medical, LLC alleges that Defendant Jeff Lukaszewski is in violation of his Employee Non-Disclosure and Non-Competition Agreement with Cork and brings claims for breach of contract, breach of fiduciary duty, and tortious interference with business relationships. Cork has moved pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction, seeking to enjoin and restrain Defendant from engaging in employment with Kinetic Concepts, Inc. (KCI) in his former Cork territories; communicating with his former Cork customers, active prospects, or referral sources; or using Cork's confidential information.

The Court held an evidentiary hearing on the motion. Cork's President, Patrick McGinley; Cork's Regional Sales Manager, David Cole; and Defendant Jeffrey Lukaszewski, testified. The parties stipulated to the admission of excerpts from the deposition testimony of Pat Kilbane and Lukaszewski. The Court admitted the following

stipulated exhibits into evidence: Exhibits 1–6, 8–32, and 42–54.  Defendant objected to the admission of Exhibit 59; the Court took the motion under advisement.  Defendant moved pursuant to Fed. R. Civ. P. 52(c) for judgment on partial findings; the Court also took that motion under advisement.  The parties filed proposed findings of fact and conclusions of law.  Having considered the evidence, the applicable law, and the parties' arguments, the Court enters the following findings of fact and conclusions of law and denies Cork's motion for preliminary injunction.

### A.

Plaintiff Cork Medical, LLC is a wound care company specializing in support surfaces, negative pressure wound therapy, wound care dressings, and related products.  Cork sells its products mainly in the Midwest.  It began as a support service company and a cushion company and expanded into selling its own negative pressure wound therapy product.  Cork has close to 75 employees; 25 of them are sale representatives.  Cork sells and distributes products predominantly through its sales representatives.  The sales representative's job function is to build relationships with wound nurses and doctors or any other nurse or doctor who might see wounds and prescribe Cork equipment.  Cork obtains sales from referral sources such as nurses, doctors, case managers, and social workers.  Case managers are hospital employees who, among other duties, help transition the patient home with a pump.  Cork expends significant time and money training and supporting its sales representatives.  Cork relies on its sales

representatives to build relationships and trust with care providers in order to understand customer preferences, schedule in-service trainings, and receive referrals.

On or about October 1, 2012, Jeffrey Lukaszewski commenced his employment with Cork as a Medical Equipment Sales Representative.  Cork requested that he execute an Employee Non-Disclosure and Non-Competition Agreement.  By executing the Agreement, Lukaszewski acknowledged that he would have access to and would acquire trade secrets and confidential information of Cork and that he would help develop and maintain goodwill with Cork's customers.  The non-disclosure of confidential information provision is found at Paragraph 6 of the Agreement and states in part:  "During employee's employment with the Company and thereafter, Employee will not use or disclose to others any of the Confidential Information …."  [*Stipulated Ex. 4* at 2].  Paragraph 6 defines "Confidential Information" as:

> any and all of the Company's trade secrets, confidential and proprietary information and all other non-public information and data about the Company and its business, including without limitation, product designs, business processes, lists of customers, information pertaining to customers, lists of referral sources, information pertaining to referral sources, marketing plans and strategies, … engineering and technical information, … data compilations, research and development information, business plans, … and information about prospective customers or prospective products and services ….

[*Id.*]

The non-competition covenants are found in Paragraph 7 of the Agreement. Paragraph 7 defines the following terms:

> "*Company's Active Prospects*" means: (A) any person or entity that Employee, on behalf of the Company, solicited, assisted in the solicitation of, or engaged in marketing, sales or business development efforts towards,

at any time during the six (6) months preceding the termination of Employee's employment with the Company….

"*Company's Customers*" means any person or entity to whom the Company (i) is selling or providing any products or services as of the time of the termination of Employee's employment with the Company or (ii) provided or sold any products or services at any time during the twelve (12) months preceding the termination of Employee's employment with the Company.

"*Competing Products/Services*" means (A) any products and/or services that are similar to and competitive with any of the products and/or services that Employee offered for sale, sold or provided, or assisted in the or provision of on behalf of the Company during Employee's employment with the Company, (B) any products and/or services that are similar to and competitive with the products and/or services being offered, sold or provided by the Company as of the date of termination of Employee's employment with the Company and/or (C) any products and/or services that are competitive with any of the products and/or services that are being offered, sold or provided by the Company as of the date of the termination of Employee's employment with the Company ….

"*Competitive Business*" means a business that offers, sells or provides any Competing Products/Services and is competitive with the business of the Company.

"*Prohibited Capacity*" means (A) in the same or similar capacity or function to that in which Employee worked for the Company, (B) in any sales, sales management or customer relationship capacity or function, (C) in any executive or managerial capacity or function, … (E) in any capacity or function in which Employee's knowledge of the Company's Confidential Information would facilitate or support Employee's work for the Competitive Business, (F) in any capacity or function in which the customer goodwill Employee helped to develop on behalf of the Company would facilitate or support Employee's work for a Competitive Business or (G) in any capacity or function in which Employee likely would inevitably use or disclose the Company's trade secrets and/or Confidential Information.

"*Referral Source*" means any person who at any time during the two (2) years preceding the termination of Employee's employment with the Company referred any customers or business to the Company.

[*Id.* at 2-3.]

4

Paragraph 7 contains the following non-competition provisions:

b.      During the Restricted Period, Employee will not within the Restricted Geographic Area engage in (including, without limitation, being employed by, working for, or rendering services to) any Competitive Business in any Prohibited Capacity; provided, however, if the Competitive Business has multiple divisions, lines, or segments, some of which are not competitive with the business of the Company, nothing herein will prohibit Employee from being employed by, working for or assisting only that division, line or segment of such Competitive Business that is not competitive with the business of the Company, provided Employee is not involved in the sales, marketing or provision of any Competing Products/Services.

c.      During the Restricted Time Period, Employee will not sell, market or provide, attempt to sell, market or provide, or assist any person or entity in the sale, marketing or provision of, any Competing Products/Services to any of the Company's Customers with respect to whom, at any time during the past two (2) years preceding the termination of Employee's employment with the Company, Employee had any sales or service contact on behalf of the Company, Employee had any business contact on behalf of the Company, Employee had any sales or service responsibility … on behalf of the Company, or Employee had access to, or gained knowledge of, any Confidential Information concerning the Company's business with such customer, or otherwise solicit or communicate with any such customers for the purpose of selling, marketing or providing, attempting to sell, market or provide, or assisting in any person or entity in the selling, marketing or provision of, any Competing Products/Services.

d.      During the Restricted Time Period, Employee will not sell, market, assist in the provision, selling or marketing of, or attempt to provide, sell or market any Competing Products/Services to any of the Company's Customers located in the Restricted Geographic Area or otherwise solicit or communicate with any of the Company's Customers located in the Restricted Geographic Area for the purpose of selling, marketing or providing, attempting to sell, market or provide, or assisting any person or entity in the selling, marketing or provision of, any Competing Products/Services.

e.      During the Restricted Time Period, Employee will not solicit or communicate with any Referral Source located within the Restricted Geographic Area for the purpose of marketing, promoting or obtaining any

referrals for the provision of, any Competing Products/Services or interfering in any way with the Company's relationship with such Referral Source.

   f. During the Restricted Time Period, Employee will not solicit or communicate with any Referral Source with whom Employee had any business contact on behalf of the Company for the purpose of marketing, promoting or obtaining any referrals for the provision of, any Competing Products/Services or interfering in any way with the Company's relationship with such Referral Source.

"Restricted Time Period" is defined as the period of Lukaszewski's employment with Cork and for two years after the termination of his employment; "Restricted Geographic Area" is defined as his sales territory.  Lukaszewski agreed that the restrictions imposed by the Agreement "are reasonable and necessary" for the protection of Cork's trade secrets, confidential information, and goodwill and that a breach or threatened breach of the Agreement by him would cause Cork irreparable injury for which money damages would be inadequate.  [*Id.* ¶¶ 9–10.]  The Agreement is to "be interpreted and enforced in accordance with" Indiana law.  [*Id.* at ¶ 13.]

   As a Cork Sales Representative, Lukaszewski sold Cork products and services including wound care dressings to patients in outpatient wound clinics and other post-acute care facilities.  His sales territory included Northwest Indiana and the South Side of Chicago.  Lukaszewski's job duties and responsibilities included establishing contacts and developing and maintaining relationships with care providers in the wound care or outpatient setting such as doctors, nurses, social workers, case managers, and would care staff, who might purchase, recommend, or make decisions on the purchase of Cork products and other negative pressure wound therapy products.  The nurses, doctors, and

other staff are employed by hospitals, rehabilitation centers, home health agencies, long-term acute care facilities (LTAC), and wound centers.

While at Cork, Lukaszewski compiled lists of prospective customers for use as sales leads based on information from nursing homes, home health agencies, doctors, and wound clinics.  He called on regular and prospective customers to solicit orders and talked with nurses in wound clinics and nursing homes.  Cole testified that the Cork Medical Job Description at Exhibit 2 was an accurate job description for Lukaszewski's position at Cork.  That job description does not reference hospitals or negative pressure wound therapy.  Lukaszewski developed relationships and trust with care providers at wound care facilities while employed at Cork.  Cork expended significant resources to assist him in developing such relationships.  This included training him and providing him with an expense account.

Patients or their insurance carriers pay for medical devices, including products offered by Cork and KCI, to be used in post-acute care settings (outpatient).  Hospitals, hospital systems, or Group Purchasing Organizations (GPOs) to which the hospitals belong pay for medical devices used in acute care settings (inpatient).  National or regional account managers negotiate the GPO agreements.  At the hearing, Defendant emphasized the difference between selling *to* hospitals and selling *in* hospitals.  In-patient or acute care sales are actual sales *to* the hospital; an outpatient or post-acute sale can be made *in* a hospital but is not *to* the hospital.  Cork had zero sales *to* hospitals during the period of Lukaszewski's employment.

Rehabilitation centers, wound clinics, LTACs, and social services departments may be divisions of a hospital located at the same physical location as the hospital inpatient facility.  A rehabilitation center, wound care clinic, and home health agency associated with a hospital may have the same owner, namely the hospital.  For example, Cole testified that Methodist Hospitals' rehabilitation center, wound care clinic, and home health agency have the same owner—the hospital.  On the other hand, some rehabilitation centers, wound care clinics, and home health agencies are managed by third-party companies that do not own or manage a hospital.

Lukaszewski did not sell any Cork product to a hospital or hospital system during his employment with Cork; in other words, he made zero inpatient sales during his employment with Cork.  No other Cork representative sold a Cork product to a hospital or hospital system in the 12 months preceding the termination of Lukaszewski's employment with Cork.  But Cork representatives provided services in hospitals as a distributor of other company's products.  Hospitals, wound clinics, social services, outpatient surgery centers, podiatrists, general surgeons, inpatient would care nurses, and home health agencies were all prospective Cork customers.  Lukaszewski denied that he called on inpatient wound care nurses.

Cole testified that at times a patient leaves the hospital with a negative pressure wound therapy pump and that Cork competes with KCI for that business.  A referral source contacts Cork, advises that a patient is going home, and suggests that the patient work with Cork to set up a pump for home use.  Lukaszewski testified that when he

worked at Cork he was compensated for selling pumps that went home with a patient transitioning from the hospital to the outpatient setting.

Lukaszewski completed weekly activity reports while at Cork.  None of the entities identified in Lukaszewski's weekly activity reports for May 5, 2014, November 17, 2014, December 15, 2014, and January 19, 2015 represent entities that Lukaszewski called on to sell negative pressure wound therapy for acute inpatient care.  The reports do not reflect what product or services Lukaszewski was attempting to sell; however, they do show that he contacted at least two inpatient wound care nurses during that time. Lukaszewski's Weekly Activity Report for November 17, 2014, indicates that he called on an inpatient nurse at "MC Hopsital" (sic) and that he talked to an inpatient nurse at St. Anthony's wound center.  [*Ex.* 20.]

In January 2015, Cork announced the launch of its own negative pressure wound therapy pump, the Nisus Pump.  (Hereinafter all dates are in 2015 unless otherwise noted).  Cork had expended three years and over one million dollars developing its own pump.  The same month, Cork held a two-day sales training for all of its sales representatives in Indianapolis, Indiana, which involved product training and sales training.  The training focused on why Cork developed certain features of the pump so that the sales representatives could sell against their competitors.  Some of the information provided during the training has not been made public.

The Nisus Pump was brought to market in March.  Lukaszewski did not sell a Nisus Pump while employed at Cork.  In 2013, 2014, and up through the date of the

preliminary injunction hearing, Cork had zero sales of the Nisus Pump for in-patient acute care, including to any facility within Lukaszewski's former Cork territory.

On March 30, Cole asked Lukaszewski if he was leaving Cork, and according to Cole, Lukaszewski responded, "absolutely not." If Cole had known that Lukaszewski was leaving Cork for KCI, he would not have trained him on Cork's pump the very next day. However, it seems that Lukaszewski was in fact actively seeking employment with KCI at that time.

On March 31, Cork held a more in-depth training on its Nisus pump for its sales representatives. The Sales Representatives, including Lukaszewski, had an opportunity to handle the pump and learned more about its features and benefits as well as Cork's formulated sales approach for presenting the pump to the market.

On or about April 7, Lukaszewski resigned his employment with Cork. That day, he spoke to Cork's President, Patrick McGinley, and advised that he had accepted a position with KCI. KCI sells negative pressure wound therapy, wound care dressings, and related products. It is known for negative pressure wound therapy, it invented the negative pressure would therapy pump, and it has the largest share of the negative pressure wound therapy market. Lukaszewski told McGinley that he would be selling KCI's products in the same territory as his Cork territory but did not believe he would be violating his non-competition agreement. McGinley attempted to persuade Lukaszewski to remain with Cork, but he declined. McGinley told Lukaszewski that April 7 would be his last day of employment with Cork.

Before returning his company-provided laptop to Cork, Lukaszewski had erased all of the records and information on the laptop. This included his weekly activity reports, contact points, and all information. The weekly activity reports indicate Lukaszewski's activities, and the customer, referral source, and prospective contacts on behalf of Cork. *See* Exs. 19-22. Lukaszewski's report of referral sources lists the customer and the referral source. *See* Ex. 6.

KCI is a division of Acelity. KCI has one division with two distinct sales groups: acute care and post-acute care. KCI's acute care sales representatives promote, market, and sell KCI products in acute care settings such as hospitals and LTAC facilities. KCI's post-acute care sales representatives market and sell KCI's products in home health care facilities, wound care clinics, and skilled nursing facilities. KCI employs Territory Coordinators to handle patient transitions from acute care to post-acute care settings.

Lukaszewski applied for a position KCI posted on-line. Pat Kilbane, KCI's hiring manager for the position, understood that Lukaszewski's responsibilities with Cork were limited to the post-acute market. During the interview process, Lukaszewski did not discuss his contacts, clients, or whether he had experience selling products in the acute care setting with Kilbane or anyone else from KCI. Lukaszewski informed Kilbane that he was subject to a non-compete agreement and gave KCI a copy of the agreement. KCI's legal counsel reviewed the agreement before offering Lukaszewsk employment. Lukaszewski's job responsibilities with KCI were to be in the hospital or acute care market.

Lukaszewski is currently employed by KCI as a Territory Manager of VAC—a patented acronym that stands for vacuum assisted closure, meaning negative pressure would therapy.  He has been employed by KCI since about April 20.  According to the job posting for his position, found at Exhibit 23, Lukaszewski is responsible for selling negative pressure wound therapy, developing and maintaining relationships with hospitals and LTAC facilities, and acting as the primary sales representative for KCI in acute care settings to influence the adoption or continued use of negative pressure wound therapy and other products; developing and managing relationships with key customer decisionmakers including clinical, procurement, and materials management staff; providing in-services, training, and guidance to customer on the use of KCI products; and managing patient transitions from acute to post-acute care.

Kilbane testified that Lukaszewski's primary responsibility as an acute care representative territory manager for KCI is to call on the acute care hospitals and LTACs in his area—the Chicago, Northwest Indiana corridor.  Kilbane also testified that the acute care representatives and post-acute care representatives are teammates who work together, share information, and collaborate.  He stated that Lukaszewski's primary responsibility was to maintain KCI's "core business," meaning negative pressure wound therapy, and related products in acute care hospitals or the inpatient setting.

Almost every hospital within Lukaszewski's former territory with Cork is under an agreement with KCI.  KCI has had these agreements for some time.  One to three years is a standard term for such agreements.  Nothing in the GPO agreements prevents Cork

from making a sale to the hospital, however.  Hospitals sometime set aside a budget amount for purchasing outside of the GPO Agreement.

Lukaszewski testified that he does not sell VACs for KCI, but he is compensated for maintaining agreements in the hospitals.  He testified that his responsibility is for products that are provided only in the acute care setting such as Prevena, ABThera, and VeraFlo—products that are useless without a pump.  However, he is compensated when KCI sells a VAC that goes home with a patient, that is, when a patient transitions from the hospital to a post-acute care setting.  And KCI does sell products and services in the post-acute care market within Lukaszewski's former Cork territory.

Lukaszewski and Kilbane have discussed Cork's products.  The latter recalled providing feedback to his team from customers about the different ways that Cork was doing business and Cork's product offerings.  Kilbane said that what Lukaszewski had shared with him about Cork products was "[r]eally not anything that I didn't already know"—that Cork attacks KCI by their service.  Kilbane Dep. 32, ll. 6-10.  According to Kilbane, Lukaszewski did not discuss any aspect of Cork's new Nisus pump with him.

Cork has no knowledge or information that Lukaszewski disclosed to KCI or anyone else the following: (1) Cork's sales or marketing information; (2) any organizational and sales employee information; (3) any advertising information; or (4) any of Cork's confidential information.  Nor does Cork have any knowledge or information that Lukaszewski sold a product for KCI that is similar to products he sold while at Cork, or that he contacted anyone on behalf of KCI that he used to call-on during his employment with Cork.

Cork has no information that Lukaszewski is competing against it on the outpatient side.  Cork does not know how many sales it has lost in Lukaszewski's former territory since he left.  No customer has advised Cork that it switched from Cork to KCI after Lukaszewski left Cork.  However, since Lukaszewski left, Cork's sales in his former territory have gone down.  Lukaszewski denied that he has taken any customers away from Cork.  The identities of Cork's customers are not confidential information; but its call points and "champions" are secret.   (Its champions purchase, make recommendations, or decisions on the purchase of negative pressure therapy, presumably recommending Cork products.)

The hospital contacts on the acute care side that are Lukaszewski's call points at KCI were established KCI contacts before KCI hired Lukaszewski.  Lukaszewski did not bring any new hospital contacts with him.  Lukaszewski testified that his call points with KCI are not the same call points that he had with Cork.  But he testified that he talks to case managers for KCI and that he talks to the same case managers for KCI that he talked to when working for Cork.

Both Cork's Nisus pump and the KCI VAC pump are negative pressure wound therapy products, perform the same basic functions, and have the same Healthcare Procedure Coding System code, E2402.

Lukaszewski admitted that he lied on the résumé he submitted to KCI and that he lied on his LinkedIn profile.  For example, his LinkedIn profile states that he implemented inpatient and outpatient negative pressure wound therapy orders and that he called on hospitals, wound clinics, surgeons, LTACs, and home health agencies for Cork.

14

Lukaszewski testified that the references to inpatient orders and surgeons were lies and that he sold in hospitals in the outpatient side only.

**B.**

Because the Court is sitting in diversity, it applies state substantive law and federal procedural law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Turnell v. CentiMark Corp.*, --- F.3d ---, No. 14-2758, 2015 WL 4561195, at *3 (7th Cir. July 29, 2015). In seeking a preliminary injunction, Cork claims that "Defendant's employment with KCI as an acute care representative selling NPWT products …, marketing and selling KCI products, and maintaining contractual relationships to hospital systems within Northwest Indiana and the Chicago area constitutes a breach of" Paragraphs 6 and 7(b)–(f) of the Agreement. [*Pl.'s Trial Br. – Preliminary Inj. Hrg.* 5.] Lukaszewski contends that he has not breached the Agreement.

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell*, No. 14-2758, 2015 WL 4561195, at *4. The party seeking a preliminary injunction must make a threshold showing that: (1) he will suffer irreparable harm if a preliminary injunction is denied, (2) there is no adequate remedy at law; and (3) he has some likelihood of success on the merits. *Id.* If the movant makes this showing, then "the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013), *cert. denied sub nom. Burwell v. Korte*, 134 S. Ct. 2903 (U.S. July 1, 2014). The balance of potential harms is weighed on a "sliding scale" against the movant's likelihood of success: "the more likely he is to win, the less the balance of harms

must weigh in his favor; the less likely he is to win, the more it must weigh in his favor."
*Turnell*, 2015 WL 4561195, at *4.

By the Agreement's terms, Indiana law governs.  Noncompetition covenants in employment contracts are in restraint of trade and disfavored under Indiana law.  *Cent. Ind. Podiatry, P.C. v. Kueger*, 882 N.E.2d 723, 728–29 (Ind. 2008).  Such covenants are strictly construed against the employer, and courts will not enforce unreasonable restrictions.  *Id.* at 729.

A noncompetition agreement must be reasonable to be enforceable.  *Id.*  To establish reasonableness, the employer must demonstrate that it has a legitimate interest to be protected and that "the agreement is reasonable in scope as to the time, activity, and geographic area restricted."  *Id.*  "[T]he advantageous familiarity and personal contact which employees derive from dealing with an employer's customers are elements of an employer's 'good will' and are a protectible interest which may justify a restraint…."  *Licocci v. Cardinal Assocs., Inc.*, 445 N.E.2d 556, 561-62 (Ind. 1983); *see also Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 781 (Ind. Ct. App. 2014) ("Goodwill includes secret or confidential information such as the names and addresses of customers and the advantage acquired through representative contact.") (quotation omitted).  And "in industries where personal contact between the employee and the customer is especially important due to the similarity in product offered by the competitors, the advantage acquired through the employee's representative contact with the customer is part of the employer's good will, regardless of whether the employee has access to confidential information."  *Id.* (quotation omitted).  Cork has a legitimate, protectable interest in its

customer good will, including in the advantages gained from Lukaszewski's contacts with its customers and potential customers that may be protected.

Turning to the reasonableness of the scope of the restrictive covenants, Indiana courts have upheld two-year time limitations as reasonable. *See, e.g.*, *Coffman v. Olson & Co., P.C.,* 906 N.E.2d 201, 208 (Ind. Ct. App. 2009). Here, the two year restriction seems reasonable. "Whether a geographic scope is reasonable depends on the interest of the employer that the restriction serves." *Cent. Ind. Podiatry*, 882 N.E.2d at 730. Here, the restricted geographic area is the Restricted Area, which is defined as the Lukaszewski's sales territory with Cork. Because the restricted geographic area is the same as Lukaszewski's former territory, and Lukaszewski used Cork resources to establish and maintain relationships in his sales territory, the geographic scope of the restrictive covenants seems reasonable. *See, e.g., id.* (noting that geographic reasonableness may depend on the area served by the company, the area served by the employee, and the area restricted by agreement); *Licocci*, 445 N.E.2d at 561–62 (indicating that a restraint limited "to the geographical area of the employee's prior operations" may be justifiable).

The reasonableness of the scope of activities restricted "is determined by the relationship between the interest the employer seeks to protect and the activities circumscribed by the provisions of the covenant." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 916 (Ind. Ct. App. 2011). "[A] covenant that restricts the employee from competing with portions of the business with which he was never associated is invalid." *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 782 (Ind. Ct. App. 2014); *see also Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 176-77 (Ind. Ct. App. 2008) (stating that a covenant not to

compete preventing plaintiff from being employed "in any capacity of any business in competition with" where plaintiff's position had been limited to soliciting sales was unreasonable). However, if part of a noncompetition covenant is unreasonable and other parts are reasonable, and the "covenant is divisible into parts," the court may engage in "blue-penciling" to eliminate the unreasonable language. *Gleeson*, 883 N.E.2d at 177; *see also Distributor Serv., Inc. v. Stevenson*, 16 F. Supp. 3d 964, 977 (S.D. Ind. 2014).

The restrictive covenant in Paragraph 7(b) of the Agreement prohibits Lukaszewski from engaging in any Competitive Business, which means a business that offers, sells or provides any Competing Products/Services and is competitive with Cork, in any Prohibited Capacity, which includes "in the same or similar capacity or function to that in which [he] worked for" Cork and in any sales or sales management capacity or function. Lukaszewski argues that the scope of this provision is unreasonably overbroad because it prevents him from working for KCI in any capacity. [*Def.'s Proposed Findings of Fact and Conclusions of Law* at 15, ¶¶ 15-17.] While the prohibition on working "in any Prohibited Capacity" is likely overly broad, *see, e.g., Distributor Serv.*, 16 F. Supp. 2d at 973-74 (concluding that "in-any-capacity" non-compete provision was overly broad as to the scope of activity covered and was thus unenforceable); *Coates*, 942 N.E.2d at 916 (noting that noncompete covenants "that restrict an employee from working for any competitor of a prior employer in any capacity" have been found overbroad and invalid), such provision appears to be divisible from other parts of the "Prohibited Capacity" definition and restrictive covenant that seem reasonable. The restrictive covenant in Paragraph 7(b) also prohibits Lukaszewski from working "in the same or similar capacity

or function" to that in which he worked for Cork, and from working in any sales or sales management capacity. These provisions do not seem overly broad or unreasonable. Because the unreasonable part of the "Prohibited Capacity" definition is divisible from the reasonable part of the definition, the Court can eliminate the unreasonable language from the provision.

Lukaszewski contends that Paragraphs 7(c) and 7(d) of the Agreement are unreasonably restrictive to the extent they preclude him from selling KCI products to hospitals or hospital systems or communicating with established KCI contracts because those entities and persons are not "Company Customers." [*Def.'s Proposed Findings of Fact and Conclusions of Law* at 15, ¶ 18.] He maintains that he did not sell a single Cork product to a hospital or hospital system while employed with Cork, but rather sold Cork products to individual patients in nursing homes, home health agencies, wound clinics, and other post-acute care settings. Because the patients or their insurance carrier paid for the products, he argues that the patients and former patients were "Company Customers" for purposes of Paragraphs 7(c) and 7(d). [*Id.* ¶ 19.] Even if the evidence failed to establish that any hospital or hospital system within Lukaszewski's former Cork territory comes within the meaning of "Company Customers" under the Agreement such that Paragraphs 7(c) and 7(d) would not apply, Cork still could show a breach of the Agreement. The restrictive covenant in Paragraph 7(b) is not limited to "Company's Customers." In other words, Lukaszewski could be in violation of Paragraph 7(b) even if neither he nor any other Cork employee ever sold a Cork product to a hospital or

hospital system during the two years before the termination of his employment with Cork.

Yet Lukaszewski argues that Cork cannot establish that he breached Paragraph 7(b) because KCI's business is divided into acute care and post-acute care, and he works exclusively within the acute care segment, and he is not selling, marketing, or providing Competing Products/Services in his employment with KCI.  [*Def.'s Proposed Findings of Fact and Conclusions of Law* at 18, ¶ 27.]  The court disagrees.  The evidence did not establish that KCI has two divisions; rather, Kilbane testified that KCI has one division with two sales groups: acute care and post-acute care.  And KCI's acute care representatives and post-acute care representatives are teammates who work together, share information, and collaborate.  Even if Lukaszewski was hired to work exclusively in the acute care setting, there was evidence that he sent an email on May 5 to his boss, Kilbane, about a patient who was discharged from Methodist hospital.  A VAC/pump had been scheduled to be delivered to the hospital, but the patient had already left by the time KCI arrived. Ex. 45.  Lukaszewski reported that the VAC was being delivered and asked Kilbane if they needed to email the patient.   Though perhaps minimal, Lukaszewski was involved in the provision of a competing product of KCI, a Cork competitor.

Moreover, even if the Court were to find that KCI has multiple divisions, it seems that Lukaszewski's work in the acute-care setting is competitive with Cork's business and that Lukaszewski is involved in the sales and provision of Competing Products/Services as defined by the Agreement.  KCI's and Cork's negative pressure wound therapy pumps

are competitive: they are substantially similar, they consist of the same basic technology, and the FDA assigns all negative pressure wound therapy pumps the same code, E2402. Cole testified that at times patients leave the hospital with a negative pressure wound therapy pump; Cork competes with KCI for that business. Lukaszewski testified that while at Cork, he was compensated for selling pumps that went home with a patient transitioning from the hospital to outpatient. And there was evidence, including KCI's job posting for Lukaszewski's position, that while employed with KCI, Lukaszewski works with patients transitioning from the acute to post-acute setting, and he is compensated when a patient goes home with a KCI pump. Although Lukaszewski does not sell KCI pumps, he sells KCI products—VeraFlo, Prevena, ABThera, and Graftjacket—that are useless unless accompanied by a negative pressure wound therapy pump.

Returning to Paragraphs 7(c) and (d) of the Agreement, Lukaszewski contends that the hospitals and hospital systems to which he sells KCI products do not qualify as "Company's Customers" under the Agreement. The Court disagrees. "Company's Customers" is defined to include any entity to whom Cork "is selling or providing any products or services" at the time of Lukaszewski's termination of employment. There is evidence that some hospitals own the rehabilitation centers, wound clinics, LTACs, and social services departments located at the same physical location as the inpatient facility. An example would be Methodist Hospital. Thus, the issue of whether the hospitals or hospital systems would be considered "Company's Customers" is not as clear as Lukaszewski argues.

Furthermore, Lukaszewski testified that he talks to case managers for KCI and he admitted that he talks to the same case managers that he talked to when he worked at Cork. The testimony established that case managers are hospital employees. Lukaxzewski is one of two call points for the case managers to get KCI pumps. It seems likely that at least some of these case managers would be considered a "Referral Source" under the Agreement. Thus, Cork there is a reasonable likelihood that Cork can prove a breach of Paragraph 7(e) and (f) of the Agreement.

Lukaszewski argues that Cork cannot prove that he breached Paragraph 6 of the Agreement because it has no knowledge or information that he has disclosed to KCI, or anyone else, any of Cork's confidential information. The evidence at the hearing established that Cork has no knowledge or information that Lukaszewski disclosed to KCI or anyone else Cork's sales or marketing information; any organizational and sales employee information; any advertising information; or any of Cork's confidential information. However, Lukaszewski has not argued a lack of evidence as to whether he has *used* any of Cork's confidential information. The Agreement prohibits not only the disclosure of confidential information, but also the use of such information. In any event, there was evidence that Lukaszewski and Kilbane discussed Cork's products. Kilbane recalled providing feedback to his team from customers about the different ways that Cork was doing business and Cork's product offering. But even if Cork cannot prove a breach of the non-disclosure of confidential information provision, it has some likelihood of success on the merits of its claim that Lukaszewski has breached the non-competition provisions.

The Court finds that Cork has a reasonable likelihood of success on the merits of its claim that Lukaszewski has breached at least Paragraph 7(b) of the Agreement and Cork has a reasonable likelihood of demonstrating that at least some of the non-disclosure and non-competition provisions of the Agreement are enforceable under Indiana law. But that is not sufficient to warrant a preliminary injunction. Cork points to the loss of good will and future revenue as the irreparable harm. It asserts that Lukaxzewski's "continued involvement in the sale of NPWT [negative pressure wound therapy] products constitutes irreparable harm because of his knowledge of the NPWT market and NPWT contacts within the Northwest Indian and Southern Chicago area and those contacts' knowledge of Defendant from his time with Cork." [*Pl.'s Proposed Conclusions of Law for Pl.'s Mot. For Preliminary Injunction* at 3, ¶ 13.]

Cork likely can show that its remedies at law are inadequate and that it will suffer irreparable harm from Lukaszewski's continued involvement in the negative pressure wound therapy market in his former Cork territory. *See Turnell*, 2015 WL 4561195, at *9 (noting that the potential damage to the former employer caused by former employee's breach of restrictive covenants in taking a job with competitor was "a canonical form of irreparable harm"); *Coates*, 942 N.E.2d at 912 (holding that former sales manager's continued involvement in competitive market could constitute irreparable harm because of his knowledge of the market, his knowledge of vendors, and his recognition by vendors and customers).

However, the harm to Cork does not appear to be significant. Although "[t]he injuries that flow from the violation of a non-compete are difficult to prove and quantify,"

*Turnell*, 2015 WL 4561195, at *9, Cork does not know how many sales it has lost in Lukaszewski's former territory since he left, and no customer has advised Cork that it switched to KCI after Lukaszewski's departure.  Furthermore, Cork has no knowledge or information that Lukaszewski disclosed to KCI or anyone any of Cork's confidential information, that he sold product for KCI that is similar to products he sold while at Cork, or that he contacted anyone on behalf of KCI that he used to call-on while at Cork.  While there appears to be some overlap between referral sources and contact persons in the acute setting and post-acute setting, the overlap appears minimal.  Whereas Lukaszewski worked primarily in the post-acute, outpatient setting for Cork, he is working almost exclusively in the acute, inpatient setting for KCI with hospitals that already had agreements and contacts with KCI.  It is not clear that the goodwill that Lukaszewski developed for Cork in the post-acute care setting can be used by KCI in the acute-care setting.  Thus, the irreparable harm to Cork does not appear to be significant.

On the other hand, Lukaszewski will suffer significant harm if the injunction is issued in error.  Prohibition against working for KCI as a Territory Manager of VAC and contacting the hospitals and LTAC facilities in his territory would prohibit him from performing his job duties and responsibilities and would make it very difficult for him to earn a livelihood.  Although Cork has a reasonable likelihood of success on the merits, the balance of harms does not favor Cork and does not support the issuance of an injunction.

**Conclusion**

Defendant's objection to Exhibit 59 is **GRANTED**; Defendant's motion for judgment on partial findings is **DENIED**; and Plaintiff's Motion for Preliminary Injunction (Dkt. 7) is **DENIED.**

   **SO ORDERED** this date:   09/04/2015


Distribution:

Via Electronic Service to Counsel

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

25